# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

GOLF SCIENCE CONSULTANTS, INC.,   )
   )
        Plaintiff,   )
   )
v.   )   No.:  3:07-CV-152
   )        (VARLAN/SHIRLEY)
ROB CHENG and   )
BOSS INTERNATIONAL,   )
   )
        Defendants.   )

## MEMORANDUM OPINION

This civil action is before the Court on Defendants Rob Cheng ("Defendant Cheng")

and Boss International's ("Defendant Boss") (hereinafter collectively referred to as

"Defendants") Motion for Summary Judgment. [Doc. 24.] Plaintiff Golf Science

Consultants, Inc. ("Plaintiff GSC") filed a response in opposition to Defendants' summary

judgment motion [Doc. 32], to which Defendants filed a reply. [Doc. 33.] The parties have

also filed supplemental briefs in this matter. [Docs. 37, 38.] The motion is now ripe for the

Court's consideration. The Court has carefully considered the pending motion, along with

the supporting materials submitted by the parties. [*See* Docs. 24, 25, 32, 33, 34, 37, 38.] For

the reasons set forth herein, Defendants' Motion for Summary Judgment [Doc. 24] will be

granted.

## I.    BACKGROUND

Defendant Cheng is the owner and General Manager of Defendant Boss, a company that markets and distributes steel golf shafts in the United States. [Docs. 25 at 2; 32 at 1.] Defendant Boss is also known as and at times referred to as "FEMCO." [*See* Doc. 2 at 1.] Plaintiff GSC is a consulting company, which is owned by Howard Butler ("Mr. Butler"), the majority owner, and Michael Twigg ("Mr. Twigg"), the minority owner. [Docs. 25 at 2-3; 32 at 2.] In December of 2003, Defendant Boss contacted Plaintiff GSC to determine if it could assist Defendant Boss with various technical issues, including golf club shaft analysis and testing. [Docs. 25 at 2; 25-1 at 2; 32 at 1.]

On May 24, 2004, Mr. Butler and Defendant Cheng spoke over the telephone regarding a business arrangement between the parties. [*See* Doc. 25-2.] On May 25, 2004, Mr. Butler sent Defendant Cheng an email and attached letter that mentioned, among other things, monthly retainer obligations and royalty fees. [Doc. 25-2 at 2-3.] According to Mr. Butler, the parties planned for Plaintiff GSC to assist Defendant Boss with the development of shaft sales and design along with associated research and technical marketing. [Doc. 25-3 at 3-4.] According to Mr. Butler, Defendant Boss paid in full all invoices for services submitted by Plaintiff GSC. [Doc. 25-3 at 7.]

On August 20, 2004, Douglas Winfield ("Mr. Winfield") came to work for Plaintiff GSC as a subcontractor. [Doc. 34 at 15.] In the subcontracting agreement, Mr. Winfield agreed to "supply technical services" for "10 man-hours" in exchange for $1,000.00 per month. [Doc. 25-10 at 2.] The subcontract provided that Mr. Winfield would "not provide

2

any consulting services related to golf shaft design or analysis to any third party during the term of this contract," which was six months from August 20, 2004, though the contract could "be renewed by the expressed mutual consent" of Mr. Winfield and Defendant GSC. [Doc. 25-10 at 2.] As a subcontractor for Plaintiff GSC, Mr. Winfield worked on "general things" for Defendant Boss, such as discussing how to improve Defendant Boss's line of golf club shafts. [Doc. 34-2 at 12.] In February of 2006, Mr. Winfield met with Defendant Cheng. [Doc. 34-4 at 1.] According to Mr. Winfield, Defendant Cheng informed him that "he's paying $1500 for me as a subcontractor." [Doc. 34-4 at 4.] According to Mr. Winfield, he had no reaction to this information and agreed that the amount seemed "about right." [Doc. 34-4 at 4.]

In 2005 and 2006, the parties sent communications regarding royalties for "insert technology," a technology that relates to the stiffness of the tip of the golf club shaft. [Doc. 25-3 at 6.] In a document dated August 1, 2005, Mr. Butler sent Defendant Cheng a communication discussing royalties for insert technology. [Doc. 25-5 at 2.] On April 18, 2006, Defendant Cheng sent Mr. Butler an email, which stated what he could "offer on the Technology," namely "5 cents per shaft sold with IT" and "$150,00 max. for 5 years." [Doc. 25-6 at 2.] Mr. Butler replied to Defendant Cheng that "your proposal to acquire GSC's IT technology is not acceptable" and that "I will be happy to provide you an acceptable proposal from GSC if you would like." [Doc. 25-6 at 2.] In another communication to Defendant Cheng, Mr. Butler discussed another arrangement regarding "IT technology" and stated "GSC gets security and you get the benefit of out technology for an extended time. It is a

3

win-win for both of us." [Doc. 32-1 at 2.] According to Mr. Butler, the terms of the royalty aspect were not finalized "to my satisfaction" and "just never got done the way I'd like for it to have been done." [Doc. 25-3 at 5.

On April 24, 2006, Mr. Butler, Mr. Twigg, and Mr. Winfield met with Defendant Cheng for a lunch meeting. [Doc. 25-3 at 10.] At the meeting, Defendant Cheng discussed potentially entering the "composite business" and also mentioned potentially employing Mr. Butler, Mr. Twigg, and Mr. Winfield at Defendant Boss. [Doc. 25-3 at 10.] According to Mr. Butler, he responded "maybe so, if we could work out the right arrangement." [Doc. 25-3 at 10.] Prior to April 24, 2006, Defendant Cheng had discussed with Mr. Butler possible offers of employment at Defendant Boss for Mr. Butler, Mr. Twigg, and Mr. Winfield, and Mr. Butler "didn't rule out anything" when Defendant Cheng mentioned the possibility. [Doc. 25-3 at 9.]

On about April 26, 2006, Defendant Cheng made a verbal offer of employment to Mr. Winfield and via email to Messrs. Butler and Twigg. [Doc. 34-4 at 17, 18.] According to Mr. Winfield, he did not negotiate a separate deal for himself with the Defendants. [Doc. 34-4 at 12.] On April 28, 2006, Mr. Butler sent an email to Defendant Cheng stating that "no business arrangements with FEMCO will be transacted or consummated without my approval." [Doc. 25-8 at 2.] Then, on the same day, Defendant Cheng sent an email to Mr. Butler stating that "[i]n light of recent events, it appears that it would be in both of our best interests to terminate our business relationship, effective immediately." [Doc. 25-9 at 2.]

4

On April 23, 2007, Plaintiff GSC filed the complaint in this action [Doc. 1], which was subsequently amended. [Doc. 2.] In the amended complaint, Plaintiff GSC raises claims for (1) breach of contract; (2) inducing breach of contract; (3) tortious interference; and (4) breach of implied covenant of good faith and fair dealing.

## II.    ANALYSIS

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question

5

for the fact finder. *Id.* at 249. The judge does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter. *Id.* Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## B. Breach of Contract

In Tennessee, the essential elements of a breach of contract claim "include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Oggs*, 230 S.W.3d at 676-77 (citation omitted). To address the substance of the breach of contract claim in this case, the Court begins by examining what Plaintiff GSC has actually alleged in its amended complaint. Defendants have argued that, to the extent Plaintiff GSC asserts this claim against Defendant Cheng, it should be dismissed due to lack of evidence or argument in support of this claim against Defendant Cheng. Plaintiff GSC's amended complaint states that "[a]s described above, Defendant, BOSS INTERNATIONAL, breached its Subcontract with Plaintiff." [Doc. 2 at 3.] Therefore, Plaintiff GSC has not made a breach of contract claim against Defendant Cheng, and summary judgment on the breach of contract claim is unnecessary as to Defendant Cheng since Plaintiff GSC has made no breach of contract claim against him individually. However, even if Plaintiff GSC did allege a breach of contract claim against Defendant Cheng individually, there is no evidence in the record of "the existence of an enforceable contract" between these particular parties. *C & W Asset*

6

*Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676-77 (Tenn. Ct. App. 2007) (quoting *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). Therefore, even if Plaintiff GSC alleged such a claim against Defendant Cheng individually, summary judgment would be appropriate due to the failure to establish an essential element of the claim.

Plaintiff GSC also contends that Defendant Boss breached an alleged "Subcontract with Plaintiff." [Docs. 2 at 3.] The parties agree that "Subcontract" refers to the alleged agreement embodied in the May 25, 2004, email and attached letter sent by Mr. Butler to Defendant Cheng. [*See* Docs. 25 at 6; 32 at 4.] These communications made at least some mention of royalties. [Doc. 25-2.] Plaintiff GSC argues that Defendants' failure to deny that there were applicable sales and failure to furnish sales figures for such royalties evidence Defendant Boss's breach of the Subcontract. Defendants counter that there was no binding contract as to royalties between the parties. Even if there were a contract as to royalties, Defendants contend that Plaintiff GSC has failed to produce factual support to show a breach or damages from an alleged contract for royalty payments.

To establish the existence of an enforceable contract, the agreement "must result from a meeting of the minds of the parties in mutual assent to the terms." *Higgins v. Oil, Chem. and Atomic Workers Int'l Union, Local #3-677*, 811 S.W.2d 875, 879 (Tenn. 1991) (citing *Johnson v. Cent. Nat'l Ins. Co. of Omaha, Nebraska*, 356 S.W.2d 277, 281 (Tenn. 1962)). "[O]ne of the elements essential to the formation of a contract is a manifestation of agreement or mutual assent by the parties to its terms, and the failure of the parties to agree

7

upon or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking." *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 566 (Tenn. Ct. App. 1990). When determining mutuality of assent, Tennessee courts have recognized that "the courts have gradually shifted from a subjective to an objective standard of intent in determining enforceability." *Higgins*, 811 S.W.2d at 879. To ascertain the meaning of words, "[t]he standard is what a normally constituted person would have understood them to mean, when used in their actual setting." *Id.* (quoting *New York Trust Co. v. Island Oil and Transp. Corp.*, 34 F.2d 655, 656 (2d Cir. 1929)). However, courts may need to "look beyond the words themselves to assess the parties' intent." *Higgins*, 811 S.W.2d at 879.

In the attached letter dated May 25, 2004, Mr. Butler writes, "A royalty fee of 6% of gross wholesale sales will be provided by FEMCO to GSC on any new shaft designs GSC provides FEMCO (the detailed terms of the royalty arrangement will be negotiated as needs require)." [Doc. 25-2 at 3.] The accompanying email similarly states that "[w]e will negotiate the terms of a royalty contract as needs arise." [Doc. 25-2 at 2.] Therefore, the parties' alleged "Subcontract" contemplates further negotiation as to royalties between the parties. In *Four Eights, LLC v. Salem*, the Tennessee Court of Appeals recognized that "an 'agreement to agree' to something in the future . . . [has] generally been held unenforceable." 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005). In other words, "[w]here substantial and necessary terms are specifically left open for future negotiations, the purported contract is fatally defective." *Id.* at 487 (citations omitted). Such is the circumstance in the present

8

case. Even when construing the language in Mr. Butler's May 25, 2004, email and attached letter in a light most favorable to Plaintiff GSC, the expressed intention by Mr. Butler of the need for further negotiation regarding royalties between the parties renders the purported royalties agreement "fatally defective." *Id.*

The parties' communications regarding royalties for insert technology further evidence their intent for further negotiations and the lack of mutual assent regarding royalties. *See Higgins*, 811 S.W.2d at 879. On August 1, 2005, Mr. Butler sent Defendant Cheng a letter with a "general outline of points to be clarified in an agreement regarding our insert technology." [Doc. 25-5 at 2.] On April 18, 2006, Defendant Cheng sent Mr. Butler an email discussing "what I can offer on the Technology." [Doc. 25-6 at 2.] On April 19, 2006, Mr. Butler responded that "your proposal to acquire GSC's IT technology is not acceptable." [Doc. 25-6 at 2.] This exchange comports with the further negotiations described in Mr. Butler's May 25, 2004, communications and the indefinite terms regarding royalties between the parties. Contracts "must be based on evidence sufficient to show offer, acceptance, and intent to affect legal relations." *Overstreet v. TRW Commercial Steering Div.*, 256 S.W.3d 626, 632 (Tenn. 2008) (citation omitted). In this case, Plaintiff GSC has not presented sufficient evidence of offer and acceptance, and the evidence before the Court shows that the parties had only reached the point of negotiations regarding royalties. Therefore, Plaintiff GSC has failed to establish the existence of an enforceable contract as to royalties, and summary judgment is appropriate on this basis alone.

9

Even if there were a binding agreement as to royalties between the parties, the Court finds that Plaintiff GSC has failed to establish "nonperformance amounting to a breach of the contract." *Oggs*, 230 S.W.3d at 677. Based on the language in Mr. Butler's letter dated May 25, 2004, it appears that Plaintiff GSC bases this claim on the "royalty fee of 6% of gross wholesale sales will be provided by FEMCO to GSC on any new shaft designs GSC provides FEMCO." [Doc. 25-2 at 3.] While Plaintiff GSC argues that Defendants' alleged failure to deny that there were applicable sales or to furnish sales figures shows a breach of contract, Plaintiff GSC has failed to direct the Court's attention to evidence in the record that support these allegations. For example, Plaintiff GSC's argument assumes that there are applicable sales for "new shaft designs" to which royalties arguably would apply, yet the record is devoid of any evidence of such new shaft designs that would have accompanying "sales." Though there is evidence that "insert technology" would qualify as "new shaft designs" [*see* Doc. 25-3 at 6], Plaintiff GSC has failed to identify evidence that Defendant Boss implemented "insert technology" into products that would have resulted in sales arguably triggering royalty obligations. Indeed, the parties' communications suggest that Defendant Boss had yet to use "insert technology" in its products since the parties were still discussing proposals to "acquire GSC's IT technology." [Doc. 25-6 at 2.] Plaintiff GSC bears the burden of proof to establish the elements of its breach of contract claim, *Oggs*, 230 S.W.3d at 676, and "must come forward with some evidence" that would allow a reasonable jury to conclude that Defendant Boss did not perform its contractual obligations. *Jones v. Blige*, 558 F.3d 485, 492 (6th Cir. 2009). For the reasons discussed above, Plaintiff GSC has failed to

10

meet this burden. This failure provides yet another basis to grant summary judgment in favor of Defendant Boss on the breach of contract claim in this case.

### C. Breach of Implied Covenant of Good Faith and Fair Dealing

In the amended complaint, Plaintiff GSC alleges that Defendants "breached the implied covenant of good faith and fair dealing that applied to the Subcontract." [Doc. 2 at 4.] In Tennessee, "[p]arties to a contract owe each other a duty of good faith and fair dealing as it pertains to the performance of a contract." *Barnes & Robinson Co. v. Onesource Facility Servs., Inc.*, 195 S.W.3d 637, 642 (Tenn. Ct. App. 2006) (citing *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996); *Elliott v. Elliott*, 149 S.W.3d 77, 84-85 (Tenn. Ct. App. 2004)). This implied-in-law covenant has two purposes: (1) it honors the contracting parties' reasonable expectations; and (2) it protects the rights of the parties to receive the benefits of the agreement they entered into. *Barnes & Robinson Co.*, 195 S.W.3d at 642 (citations omitted). Notably, a breach of the implied covenant of good faith and fair dealing is not an independent basis for relief, but rather "may be an element or circumstance of recognized torts, or breaches of contracts." *Solomon v. First Am. Nat'l Bank of Nashville*, 774 S.W.2d 935, 945 (Tenn. Ct. App. 1989) (discussing how "good faith, or the lack of it is [not], standing alone, an actionable tort"); *see also Envoy Corp. v. Quintiles Transnat'l Corp.*, No. 3:03cv0539, 2007 WL 2173365, at *8 (M.D. Tenn. July 26, 2007) (finding that

"absent a valid claim for breach of contract, there is no cause of action for breach of an implied covenant of good faith and fair dealing").[1]

As already discussed, Plaintiff GSC has not asserted a breach of contract claim against Defendant Cheng or, at a minimum, has failed to establish an essential element of such a claim against him individually. As a result, there is no basis for a claim based on a breach of an implied covenant of good faith and fair dealing against Defendant Cheng, and the Court will grant summary judgment to the extent Plaintiff GSC makes such a claim against Defendant Cheng individually.

As to Defendant Boss, the Court previously found that Plaintiff GSC has failed to establish a valid claim for a breach of contract. A claim for the breach of the implied covenant of good faith and fair dealing does not provide an independent basis for relief and is, rather, a potential "element or circumstance of recognized torts, or breaches of contracts." *Solomon*, 774 S.W.2d at 945. In other words, this claim is just "part and parcel" of Plaintiff GSC's breach of contract claim. *Envoy Corp.*, 2007 WL 2173365, at *8. As discussed above, Plaintiff GSC has failed to establish at least two elements of its breach of contract claim against Defendant Boss: (1) the existence of an enforceable contract and (2) nonperformance amounting to a breach of the contract. *Oggs*, 230 S.W.3d at 676-77. Such deficiencies remain regardless of whether Plaintiff GSC presents evidence to support its

---

[1]Though the district court in *Envoy Corporation* was interpreting North Carolina law, the principles and reasoning are nonetheless persuasive in light of similar reasoning in *Solomon*, 774 S.W.2d 935.

allegations regarding a breach of the implied covenant of good faith and fair dealing. Put another way, Plaintiff GSC's claim, which includes the breach of the implied covenant of good faith and fair dealing as an element, necessarily fails because it cannot establish *all* the prima facie elements of its breach of contract claim. As a result, the Court will grant summary judgment in favor of all the Defendants to the extent Plaintiff GSC claims a breach of the implied covenant of good faith and fair dealing.

### D.    Inducing Breach of Contract

In its amended complaint, Plaintiff GSC alleges that Defendants' actions constituted an inducement of breach of contact, as provided by Tennessee statute. Tenn. Code Ann. § 47-50-109 provides:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Notably, the statute "is but a statutory declaration of the common law tort action, expressly substituting treble damages for punitive damages." *Polk and Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 542 (Tenn. 1989). The seven elements for a claim based on the "interference in the performance or procurement of the breach of contract" are: (1) there must be a legal contract; (2) the wrongdoer must have knowledge of the existence of the contract; (3) there must be an intention to induce its breach; (4) the wrongdoer must have acted maliciously; (5) there must be a breach of the contract; (6) the act complained of must be the

13

proximate cause of the breach of the contract; and (7) there must have been damages resulting from the breach of the contract. *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 359 (Tenn. Ct. App. 1999) (citing *Dynamic Motel Mgmt., Inc. v. Erwin*, 528 S.W.2d 819, 822 (Tenn. Ct. App. 1975)).

In the present case, Defendants argue that this claim must fail because Plaintiff GSC has no evidence of Defendant Cheng's awareness of the subcontract with Mr. Winfield or any other contract that would prohibit Defendant Boss from making an offer of employment. Defendants further argue Plaintiff GSC cannot establish that Defendants intended to induce Mr. Winfield to breach a contract, that Defendants acted maliciously, that Mr. Winfield breached his contract, or that any damages resulted.

Plaintiff GSC responds that Defendants "systematically attempted to undermine [Mr. Winfield and Mr. Twigg's] contractual relationship and induce the subcontractors to breach their contract with Plaintiff [GSC]." [Doc. 32 at 4.] Plaintiff GSC cites to several pages in Mr. Winfield's deposition to support this argument; however, none of those pages are part of the record before the Court. [*See* Doc. 34.] Moreover, in their reply brief, Defendants identified Plaintiff GSC's reliance on deposition testimony that was not part of the record. [Doc. 33 at 6.] However, Plaintiff GSC did not rectify or even address the apparent problem in its supplemental brief despite attaching a different evidentiary exhibit to the brief. [*See* Doc. 37.] In light of all of this, the Court will not consider those portions of Mr. Winfield's deposition testimony that were not presented as evidence. *See Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 831 (6th Cir. 2005) (finding that a plaintiff did not present

14

evidence of damages when the "actual documents were not presented by evidence by either party").

Plaintiff GSC bases its inducement claim on two general acts of Defendants: (1) disclosing compensation information in "an attempt to induce [Mr.] Winfield to terminate his relationship with Plaintiff in favor of employment with Defendants" and (2) persuading [Mr.] Winfield "to disclose confidential information on IT technology." [Doc. 37.] As to the second alleged act, the Court notes that Plaintiff has not identified evidence on the record to support this allegation. As previously discussed, certain portions of Mr. Winfield's deposition cited to by Plaintiff GSC are not in the record and, therefore, not for the Court's consideration on summary judgment. While Plaintiff GSC has presented hundreds of "other" pages from Mr. Winfield's deposition, it has not identified to the Court those parts of Mr. Winfield's deposition, or even other evidence on the record, that support the allegations that Defendant Cheng persuaded Mr. Winfield to disclose confidential information about insert technology. Furthermore, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . . Rule 56 allocates that duty to the opponent to the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n.7 (5th Cir. 1992)) (omission in original). Due to the lack of sufficient evidence, Plaintiff GSC's claim fails to the extent it alleges that

Defendants, Defendant Cheng in particular, persuaded Mr. Winfield to disclose confidential information about insert technology.

Plaintiff GSC also bases its inducement claim on Defendants' alleged disclosure of compensation information to Mr. Winfield in "an attempt to induce [him] to terminate his relationship with Plaintiff in favor of employment with Defendants." [Doc. 37 at 1.] Unlike the allegations regarding insert technology, Plaintiff GSC has identified a specific portion of Mr. Winfield's deposition in support of this allegation. [*See* Doc. 34-4 at 3-4.] Specifically, Mr. Winfield testified that Defendant Cheng told him that "he's paying $1500 for me as a subcontractor." [Doc. 34-4 at 4.] Furthermore, an invoice to Defendants, dated September 1, 2004, stated that "Winfield is now under contract with a non-compete." [Doc. 32-5 at 2.] When construed in a light most favorable to Plaintiff GSC, the Court finds that this evidence at least raises a genuine issue of material fact as to whether Defendants had an awareness that Mr. Winfield had a contract with Plaintiff GSC, which included a non-compete provision. When construed in a light most favorable to Plaintiff GSC, such evidence sufficiently establishes the prima facie elements of (1) a legal contract and (2) knowledge of the existence of Mr. Winfield's contract with Plaintiff GSC.

Nevertheless, the Court agrees with Defendants that summary judgment is appropriate because Plaintiff GSC has failed to present sufficient evidence that Defendants' alleged "attempt to induce [Mr.] Winfield to terminate his relationship with Plaintiff in favor of employment with Defendants" resulted in Mr. Winfield terminating his contract with Plaintiff GSC. [Doc. 37 at 1.] In Tennessee, one of the elements for an inducement of

16

breach of contract claim is that "[t]here must be a breach of the contract." *Buddy Lee Attractions, Inc.*, 13 S.W.3d at 359. In this case, Plaintiff GSC has failed to present and identify evidence in the record that establishes that Defendants' alleged efforts of disclosing the compensation information successfully achieved what Plaintiff GSC contends was the desired result. It is undisputed that it was Plaintiff GSC, not Mr. Winfield, who eventually terminated its relationship with Mr. Winfield in May of 2006. [Docs. 25 at 3; 32 at 2.] Therefore, Plaintiff GSC cannot prevail on this claim as there is insufficient evidence of a breach of contract by Mr. Winfield terminating his contract.

Furthermore, Plaintiff GSC has failed to present sufficient evidence that "[t]he act complained of [was] the proximate cause of the breach of the contract." *Buddy Lee Attractions, Inc.*, 13 S.W.3d at 359. After learning about the compensation information from Defendant Cheng, Mr. Winfield testified that he had no reaction to this information and agreed that the amount seemed "about right." [Doc. 34-4 at 4.] Plaintiff GSC has not identified to the Court any other evidence that establishes this element. Therefore, even when the evidence is construed in a light most favorable to Plaintiff GSC, there is insufficient evidence of the necessary causal link for Plaintiff GSC's inducement of breach of contract claim.

In addition to Mr. Winfield, Plaintiff GSC has also contended that Defendants also "systematically attempted to undermine" Plaintiff GSC's contractual relationship with Mr. Twigg. [*See* Doc. 32 at 4.] As discussed in relation to Mr. Winfield, an inducement claim includes the element requiring a breach of the contract. *See Buddy Lee Attractions, Inc.*, 13

17

S.W.3d at 359. However, as with Mr. Winfield, there is no evidence showing that Mr. Twigg breached a contract with Plaintiff GSC or that any alleged breach resulted from the actions of Defendants. Consequently, Plaintiff GSC cannot prevail on its inducement claim to the extent it is based on Defendants' alleged actions as to Mr. Twigg.

In light of all of this, the Court will grant summary judgment in favor of Defendants on the inducement of breach of contract claim.

### E.    Tortious Interference with Business Relationships

The Supreme Court of Tennessee has expressly adopted the tort of intentional interference with business relationships. *Trau-Med of Am., Inc., v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). The elements for this common law cause of action are: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from tortious interference. *Id.*

In the present case, Plaintiff GSC alleges that Defendants' actions constitute tortious interference with its business relationships. However, Plaintiff GSC does not expressly identify in its amended complaint or summary judgment filings what third party business relationships upon which it bases this claim. To the extent Plaintiff GSC may be referring to other existing or potential customers, clients, and business entities, the Court agrees with

18

Defendants that Plaintiff GSC has failed to establish at least two necessary elements for this claim. First, Plaintiff GSC has failed to present sufficient evidence of "an existing business relationship with *specific* third parties or a prospective relationship with an *identifiable* class of third persons." *Trau-Med of Am., Inc.*, 71 S.W.3d at 701 (emphasis added). Generalized references to third parties simply fails to meet the specificity needed for this element. *Overnite Transp. Co. v. Teamsters Local Union No. 480*, No. M2002-02116-COA-R3-CV, 2004 WL 383313, at *13 (Tenn. Ct. App. Feb. 27, 2004) (finding allegations of "only general categories of persons" as falling short of stating an intentional interference claim). Similarly, Plaintiff GSC has not identified to the Court any evidence of "the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general" as to existing or potential customers, clients, businesses, or other parties not specifically identified by Plaintiff GSC. *Trau-Med of Am., Inc.*, 71 S.W.3d at 701. In light of the lack of such evidence and cogent argument from Plaintiff GSC as to these prima facie elements, the Court agrees with Defendants that summary judgment is proper to the extent Plaintiff GSC may base this claim on relationships with existing or potential customers, clients, businesses, or other unspecified parties.

In its amended complaint, Plaintiff GSC seeks its tortious interference with business relationships claim "in the alternative" to its other claims based on Defendants' actions. [Doc. 2 at 4.] Thus, Plaintiff GSC may also be attempting to base this claim on its relationships with Mr. Winfield and Mr. Twigg. In *Trau-Med of Am., Inc.*, the Tennessee Supreme Court adopted the Restatement's discussion of relations protected against

19

intentional interference, which include "[i]nterference with the exercise by a third party of an option to renew or extend a contract with the plaintiff." 71 S.W.3d at 701 n.4 (quoting Restatement (Second) of Torts § 766B cmt. c). In this case, there is sufficient evidence on the record of a sufficient business relationship between Plaintiff GSC and Messrs. Winfield and Twigg. [*See* Docs. 25-10 at 2; 32-1 at 2.] Also, the Restatement's inclusion of "an option to renew or extend a contract with the plaintiff" suggests that continued employment of these individuals with Plaintiff GSC may serve as a sufficient "relation" for the intentional interference claim. Mr. Butler's deposition further evidences Defendants' awareness of these particular business relationships with Plaintiff GSC based on discussions between Defendant Cheng and Mr. Butler about the possible employment of these individuals with Defendant Boss. [*See* Doc. 25-3 at 9.] Therefore, Plaintiff GSC has sufficiently established the prima facie elements regarding relationships and awareness by Defendants.

Nevertheless, summary judgment is appropriate as to this claim. The Restatement provides that there is liability only when interference consists of "inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." Restatement (Second) of Torts § 766B.[2] For such a claim, there must be sufficient evidence that a defendant "intentionally caused a breach in [a plaintiff's] relationships." *Overnite Transp. Co.*, 2004

---

[2]Though the Restatement is merely persuasive authority as to those portions that have not been adopted by the Supreme Court of Tennessee, it nonetheless provides additional insight and guidance on tortious interference of business relationships claims, particularly in light of the Supreme Court of Tennessee's express adoption of the Restatement (Second) of Torts § 766B cmt. c. *Trau-Med of Am., Inc.*, 71 S.W.3d at 701 n.4.

WL 383313, at *13. In the present case, there is insufficient evidence that Defendants' alleged acts caused either Mr. Twigg or Mr. Winfield to breach or break their relationships with Plaintiff GSC. Even when the evidence is construed in a light most favorable to Plaintiff GSC, Mr. Twigg and Mr. Winfield did not choose to end their relationships with Plaintiff GSC. In the case of Mr. Twigg, Plaintiff GSC has identified no evidence that shows Mr. Twigg ever stopped working for or otherwise failed to continue his relationship with Plaintiff GSC. In the case of Mr. Winfield, it was Plaintiff GSC, not Mr. Winfield, who chose to terminate the subcontract. Thus, Plaintiff GSC cannot establish that Defendants caused Mr. Winfield to not enter into or continue his relationship with Plaintiff GSC. Plaintiff GSC has failed to establish that Defendants prevented Plaintiff GSC from continuing the relationship since Plaintiff GSC made the choice to terminate Mr. Winfield's contract. As a result, Plaintiff GSC cannot prevail on its tortious interference of business relationships claim, and summary judgment is appropriate as to that claim.

## III.    CONCLUSION

For the reasons set forth herein, Defendants Rob Cheng and Boss International's Motion for Summary Judgment [Doc. 24] will be **GRANTED**, whereby plaintiff Golf Science Consultants, Inc.'s claims will be **DISMISSED with prejudice**.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

21